Straughn v. Delta Air Lines, Inc.      CV-98-396-M    03/21/00

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Claire A. Straughn,
      Plaintiff

      v.                                    Civil No. 98-396-M
                                            Opinion No. 2000 DNH 073
Delta Air Lines, Inc.
and ESIS, Inc.,
      Defendants


### O R D E R


Claire Straughn brings this action against her Employer, Delta Airlines and its agent, ESIS, seeking damages for alleged acts of gender and racial discrimination.  She also raises state law claims for wrongful termination, breach of contract, and defamation.  Delta has moved for summary judgment as to all counts against it, denying any wrongful conduct and claiming that it is entitled to judgment as a matter of law.  Plaintiff objects.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could

2

reasonably find in its favor.  See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Factual Background**

Straughn began working for Delta as a reservations sales agent in 1983.  In 1995, she became a sales representative,

assigned to a territory in western New Hampshire and all of Vermont. On January 19, 1996, while calling on an account, she fell and broke her wrist. As a result of that injury, Straughn was out of work continuously until July of 1996, when she returned to work briefly, but then went out again, saying she was in too much pain. She asked to work from a home "virtual office," but that request was denied. Delta says it concluded that Straughn needed to be in the office "to familiarize with the numerous changes that had taken place in her extended absence." Delta's memorandum (document no. 28) at 6. In response, Straughn says she told her supervisor, Lou Giglio, that Delta was violating federal law (presumably the ADA) by refusing to accommodate her disability. According to Straughn, Giglio was unmoved. Straughn unsuccessfully attempted to return to full-time employment on several occasions, on which she came into work for a few days (possibly as long as a week), but was unable to continue.

During the course of her disability, Straughn continued to receive her full salary from Delta. In addition, she received workers' compensation benefits through ESIS, the administrator of Delta's self-insured workers' compensation benefit plan. Finally, Straughn also received periodic checks from ESIS as reimbursement for expenses she incurred related to medical appointments, prescription medications, travel, etc.

Straughn says that she never dealt directly with Delta regarding her workers' compensation benefits, but dealt exclusively with an employee of ESIS. Delta, a corporate entity, is charged with knowledge that Straughn was receiving her full salary and that its agent, ESIS, was paying her workers' compensation benefits. Nevertheless, it appears that those with whom Straughn worked, particularly those directly responsible for administering her salary, did not know that she was receiving both a full salary from Delta as well as workers' compensation benefits.

Delta employees who are injured on the job are entitled to accident leave for up to 13 weeks, plus accumulated sick leave and vacation time, at their full salary. During that period, employees who are also receiving weekly benefits under applicable workers' compensation laws must reimburse Delta in an amount equal to the benefits received from the workers' compensation plan. See Delta's Accident Leave Policy, Exhibit J to plaintiff's memorandum ("Personnel who receive weekly benefits for occupational injury or illness under the provisions of applicable Worker's Compensation laws must reimburse the Company in an amount equal to the sum of all such weekly benefits received for the period during which the Company pays the employee's wages, in whole or in part, under accident leave, sick leave, and disability benefit policies."). In Massachusetts (where Straughn was employed), workers' compensation checks must, by law, be mailed directly to the employee. Accordingly, Delta requires that its employees sign those checks over to Delta upon receipt. Straughn neglected to sign over her workers' compensation benefit checks and, for some reason, Delta did not,

6

at least initially, recognize that failure.  Delta's oversight, and Straughn's failure to comply with the policy requiring employees receiving full salary benefits to sign over workers' compensation benefit checks, resulted in Straughn's receipt of approximately $11,000 to which she was unarguably not entitled.

In March of 1997, Delta says it realized that Straughn had not been removed from the active payroll for the period between January, 1996 and March, 1997.  Accordingly, it began to review all of the benefits she had received since the time of her accident.  Delta says that on two separate occasions, Giglio asked Straughn whether she was receiving workers' compensation benefits.  Straughn said that she was not, but acknowledged that she was receiving money to assist her with transportation and related medical expenses (presumably, a reference to the reimbursement checks she received from ESIS).  At her deposition, Straughn recalled the events as follows:

> A.    And, he said to me, and I am remembering
>       this, he said, "By the way, <u>did you receive
>       any money from compensation</u>?"

Q.   And what did you answer?

A.   <u>I told him, no</u>.  The money that compensation
     gave me I used to order out my meals, to help
     take care of myself, because I was not able
     to do anything.  I had no support system,
     which I went in explaining to him. . . .

Q.   Could you have said, when he asked you did
     you receive any money from compensation, "No,
     they gave me money for food, transportation
     and expenses directly related to my
     accident"?

A.   I could have said something like that.


Straughn deposition at 111-12 (emphasis supplied).


     Delta says that Giglio, who was unfamiliar with workers'

compensation claims and, in particular, cases involving the

overpayment of benefits, contacted a representative of the

personnel department, Michelle McColly, for guidance.  McColly

instructed Giglio to again inquire into Straughn's receipt of

workers' compensation benefits and ask her to put her response in

writing.  Again, although she acknowledged receiving

reimbursement checks for transportation, medical, and related

expenses, Straughn denied receiving workers' compensation

benefits.  In light of the seemingly clear discrepancy between Straughn's statements and Delta's (and ESIS's) records, pursuant to instructions from Ms. McColly, Giglio informed Straughn that she was suspended, pending an investigation.

Straughn claims that her responses to Giglio's inquiries about her receipt of workers' compensation benefits were ambiguous, that Giglio purposefully neglected to seek clarification of those responses, and, instead, used them to orchestrate her termination.  She flatly denies lying to or attempting to deceive Giglio.  She claims that "the entire 'lie' was concocted by Mr. Giglio and it was Mr. Giglio who chose to bait Ms. Straughn in the way that he did as a way to get her fired because he did not want an African-American woman working for him as a Sales Representative."  Plaintiff's memorandum (document no. 65) at 28.

Delta denies that any such plot existed, and says the matter is rather straightforward.  Delta's records confirmed that

9

Straughn was receiving her full salary, and ESIS's records confirmed that Straughn was also receiving workers' compensation benefits. So, Delta realized that she might be receiving (and retaining) duplicate payments. Accordingly, it looked into the matter by, among other things, directly asking Straughn whether that was the case. Delta says that, from its perspective, Straughn's responses were consistently unambiguous and false. Moreover, Delta claims that Straughn's written statement (given after Giglio informed her or her suspension) demonstrates that she knowingly, purposefully, and repeatedly lied about her receipt of workers' compensation benefits. In that written statement, Straughn admitted to having misled Giglio, but offered an explanation:

> When I spoke to my attorney she advised me until she had an opportunity to look into this <u>do not advise of comp money</u>. When I spoke to CE [the agent of ESIS] again she reiterated above info. Also was advised by attorney & CE all will be settled. When Lou [Giglio] asked me if I received comp, <u>all I thought of was attorney advi[c]e</u>.

Exhibit 6 to Straughn deposition (emphasis supplied).

Subsequently, in one of her affidavits, Straughn explained her

exchange with Giglio as follows:

> I was called into Lou [Giglio's] office and asked if I
> had received money from compensation to which I
> initially responded no, but went on to explain to him
> as I had in the past that I had received money from
> compensation to help with my expenses such as food,
> medicine, transportation, etc.

Affidavit of Claire Straughn, Exhibit 4 to Straughn deposition.

See also Deposition of Helen Meinhold at 51 ("Lou [Giglio] asked

Claire whether she had received any additional monies in addition

to her paycheck." [Question: "And what was her response?"]  "No;

that she only had gotten reimbursement of some medical

expenses.").

It is important to note that in addition to the weekly

workers' compensation benefit checks Straughn received from Delta

(through ESIS), she also submitted separate requests to ESIS for

reimbursement of various expenses she incurred in connection with

traveling to and from her medical appointments, undergoing

11

medical testing, purchasing prescription medication, and other related expenses.  <u>See</u> Straughn's deposition at 125-26.  <u>See also</u> Exhibit 7 to Straughn deposition (handwritten letters from Straughn to Delta's agent, ESIS, requesting reimbursement for such expenses).  Thus, Straughn's seemingly odd (and ostensibly ambiguous) "no, but yes" response to Giglio's inquiry about her receipt of workers' compensation benefits makes perfect sense in context and is, in fact, unambiguous.  She denied receiving workers' compensation benefits from ESIS (which she was obligated to sign over to Delta), but acknowledged that ESIS had honored her periodic requests for reimbursement of medical, travel, and related expenses.  That response simply did not jibe with the records maintained by Delta and its agent, ESIS.

Accordingly, Delta says its employees reasonably and justifiably believed that when Straughn denied receiving monies from workers' compensation but went on to explain that she had received financial assistance and reimbursement for travel and medical expenses, she was knowingly and purposefully attempting

12

to create the false impression that she was not receiving weekly workers' compensation benefit checks. In other words, the only payments she acknowledged receiving were the expense reimbursement checks ESIS issued in response to her separate requests. Plainly, that was not the case.

On May 8, 1997, Giglio recommended that Delta consider terminating Straughn's employment due to her lack of candor when responding to questions about her receipt of workers' compensation benefits. On May 27, 1997, Michelle McColly, of Delta's personnel department, reviewed that recommendation and agreed that Delta should ask Straughn to resign or, in the alternative, fire her for conduct unbecoming a Delta employee. She also recommended that Straughn be asked to reimburse Delta for the $11,608.86 that she was overpaid. Subsequently, Mr. Ealey (Delta's Director of Equal Opportunity) reviewed the matter, as well as the recommendations submitted by Giglio and McColly, and decided to terminate Straughn's employment with Delta.

13

On June 25, 1997, Straughn was notified that she had been terminated for having repeatedly misled her superiors about her receipt of the workers' compensation benefits. She appealed that decision and, in July, explained to an internal corporate appellate panel the circumstances surrounding her receipt of the benefits and the basis for her (at the very minimum) confusing responses to Giglio's inquiries. The panel (which included Ms. McColly) apparently accepted that Delta was perhaps responsible for some of the "confusion" regarding the overpayment of benefits to Straughn and her reimbursement obligation. Accordingly, it recommended that Straughn be reinstated, but to a different position.[1]

Delta claims that given all of the circumstances, including Straughn's demonstrated lack of candor with her superiors, it was determined that she should be reinstated, but placed in a

---

[1]    When asked whether he considered Straughn's reinstatement to a lower position a form of discipline, Delta's Director of Equal Opportunity, Richard Ealey, said: "No.  I consider it just a reward to return to work.  She was terminated. We brought her back."

position where she could be more closely supervised. Accordingly, her employment was reinstated, but she was assigned to the position of sales staff assistant, which paid less than her previous position as a sales representative. A "Final Warning Letter" was also placed in Straughn's personnel file. She reported for work on November 17, 1997. Delta says that very few employees are reinstated on appeal and those who are reinstated always receive Delta's highest level of discipline short of termination: a "Final Warning Letter." See Deposition of Richard Ealey at 97 (Exhibit E to plaintiff's memorandum).[2]

---

[2] The "Final Warning Letter," which was prepared by Giglio with the approval of Ealey, provided, in part:

> Even if you did not intend to keep these overpayments, your failure to monitor these payments and to fully advise Delta of these overpayments causes us great concern with respect to your ability to be a reliable and effective Sales Representative. As you know, that position entails great autonomy and responsibility, including the handling of company resources, and we do not believe you should hold such a position at this time considering the way you handled these overpayments. Consequently, we have decided to reinstate your employment as a Sales Staff Assistant.

Exhibit U to plaintiff's memorandum. See also Deposition of Richard Ealey at 97.

15

In support of her federal discrimination claims, Straughn points to the manner in which Delta handled her termination and subsequent reinstatement to a lower position, claiming that it was largely the product of Giglio's plot to see that she was fired. She also claims that Delta disciplined her more harshly than a similarly situated white male employee, who lied to his superiors by falsifying the number of times that he had visited his accounts. Straughn says that Delta merely transferred that employee to another region, while she was demoted to a position of less responsibility and lower pay.

Straughn also recounts several instances in which she claims to have been called "stupid" by Delta's Zone manager, Helen Meinhold; demeaned by Giglio's use of an affected accent which she describes as imitating the speech of "southern Blacks" (a point Giglio vigorously denies, with support from affidavits submitted by co-workers of both Giglio and Straughn); assigned an undesirable sales territory; denied reimbursement for a second phone line in her home and incidental expenses incurred while

16

entertaining customers; and denied the opportunity to work from a home "virtual office."  She claims that these events paint a picture of a work environment in which she, as an African-American woman, was discriminated against and, eventually, wrongfully accused of dishonesty, terminated, and then reinstated at a lower position.[3]

---

[3]     It is, perhaps, worth noting that Straughn's Title VII claim relates exclusively to her termination and subsequent rehiring at a lower position.  While she points to various anecdotal pieces of evidence in support of her claim that she was subjected to gender-based and/or racial discrimination by co-workers (for example, her assertion that she was called "stupid" or an "idiot"), that evidence is of little moment in this case. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.").

For purposes of Straughn's federal claims, the relevant evidence is that which suggests that Giglio bore a racial and/or gender-based animus toward her.  This is so because, as plaintiff herself acknowledges, she has no evidence (or reason to believe) that those who actually made the decision to terminate her were in any way motivated by unlawful discriminatory motives.  The substance of her claim is that Giglio, for unlawful reasons, misled Delta supervisory personnel into believing that there was a reasonable and justifiable basis upon which to discipline her (i.e., her lack of candor) when, in fact, there was none.

17

Delta denies any such discrimination and says that Straughn "was suspended and terminated for one reason and one reason only - she cashed over $11,000 in workers' compensation checks to which she was not entitled and lied about it when confronted by her managers." Delta's memorandum at 2.

In its counterclaim, Delta seeks reimbursement for approximately $11,000 in excess payments made to Straughn from January through July of 1996 (representing the workers' compensation benefit checks which should have been endorsed over to Delta). Delta does not, however, seek to recover the roughly $20,000 in excess payments made to Straughn from July, 1996 through March, 1997 (during which time Delta erroneously continued to pay her full salary). Apparently, Delta concedes that those payments were made, at least in part, due to its own administrative oversight, and waives any right to recover.

**Discussion**

I.   Federal Claims: Gender-Based and Racial Discrimination.

A.   The Analytical Framework.

Title VII of the Civil Rights Act of 1964 (as amended) makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, . . . sex, or national origin."  42 U.S.C. § 2000e-2(a). Similarly, section 1981 of Title 42 makes it unlawful for employers to discriminate on the basis of an employee's race.

In cases such as this, where there is little overt evidence of gender-based or racial discrimination, courts typically employ the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996) (observing that the familiar burden-shifting framework

articulated in McDonnell Douglas also applies to racial

discrimination claims arising under § 1981).  The Court of

Appeals for the First Circuit has summarized the McDonnell

Douglas burden-shifting paradigm as follows:

> Under this formulation, a plaintiff opens with a prima
> facie showing of certain standardized elements
> suggestive of possible discrimination.  . . .
>
> Establishment of the prescribed prima facie case
> creates a presumption that the employer engaged in
> impermissible age discrimination.  However, to rebut
> this presumption, the employer need only "articulate a
> legitimate nondiscriminatory reason for the employee's
> termination."  The employer's obligation is simply one
> of production.  "The burden of persuasion remains [the
> employee's] at all times."

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir.

1993) (citations omitted).  And, the Supreme Court has instructed

that,

> [Once] the defendant has succeeded in carrying its
> burden of production, the McDonnell Douglas framework -
> - with its presumptions and burdens - is no longer
> relevant.  To resurrect it later, after the trier of
> fact has determined that what was "produced" to meet
> the burden of production is not credible, flies in the
> face of our holding in Burdine that to rebut the
> presumption "the defendant need not persuade the court

20

> that it was actually motivated by the proffered reasons." 450 U.S. at 254. The presumption having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture.

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993). The employee must then demonstrate that the reason articulated by the employer for his or her termination was a mere pretext for unlawful race or gender discrimination. See LeBlanc, 6 F.3d at 842. And, in this circuit, the employee must produce "not only minimally sufficient evidence of pretext, but evidence that overall reasonably supports a finding of discriminatory animus." Id., at 843 (citation and internal quotations omitted).

So, to avoid summary judgment, the employee must come forward with evidence, either direct or circumstantial, of the employer's discriminatory animus. He or she "may not simply refute or question the employer's reasons. To defeat summary judgment at this stage, a plaintiff must produce evidence that the real reason for the employer's actions was discrimination." Gadson v. Concord Hospital, 966 F.2d 32, 34 (1st Cir. 1992).

21

B.    Straughn's Claims and Evidence.

Assuming that Straughn has established a prima facie case of unlawful race and gender-based discrimination,[4] the burden falls upon Delta to articulate a legitimate, non-discriminatory justification for the adverse employment action it took against her.  "At this second stage, the framework imposes on the defendant only a burden of production.  The burden of persuasion remains at all times with the plaintiff."  Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999), cert. denied, __ U.S. __, 2000 WL 36218 (Feb. 22, 2000).  Delta has met its burden by asserting that it disciplined Straughn for having repeatedly misled her superiors when asked about her receipt of workers' compensation benefits.  If taken as true, such evidence supports Delta's claim that "there was a nondiscriminatory reason for the

_____

[4]    Delta denies that Straughn has made the relatively low threshold showing necessary to establish a prima facie case. Specifically, it says that she has failed to demonstrate that she was treated differently from similarly situated employees of Delta.

22

adverse action" taken against Straughn.  <u>St. Mary's Honor Center</u>

<u>v. Hicks</u>, 509 U.S. at 509.[5]


So, the burden of persuasion reverts to Straughn, who must

introduce sufficient evidence to permit a reasonable trier of

fact to conclude that Delta's stated motivations are simply a

pretext for unlawful race and/or gender-based discrimination.  At

this stage, Straughn must:


> demonstrate that the proffered reason was not the true
> reason for the employment decision.  This burden now
> merges with the ultimate burden of persuading the court
> that she has been the victim of intentional
> discrimination.  She may succeed in this either
> directly by persuading the court that a discriminatory
> reason more likely motivated the employer or indirectly
> by showing that the employer's proffered explanation is
> unworthy of credence.


<u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 256

(1981) (citing <u>McDonnell Douglas</u>, 411 U.S. at 804-05)).

---

[5]    Even if Straughn did not actually lie to her superiors
but, as she asserts, simply gave vague, incomplete, and ambiguous
responses, she can not reasonably deny that those Delta employees
who made the final decision to discipline her for her lack of
candor actually believed that she had lied to her superiors.

23

Importantly, Straughn may not simply deny or question Delta's reason for disciplining her. "To defeat summary judgment at this stage, a plaintiff must produce evidence that the real reason for the employer's actions was discrimination." Gadson v. Concord Hospital, 966 F.2d at 34. Thus, Straughn must not only put forth evidence which suggests that Delta's proffered explanation is a pretext; she must also show that it is a pretext for illegal race or gender-based discrimination. See Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994).

Straughn acknowledges (as she must) that Giglio did not make the decision to terminate her employment; that decision was made by higher-ranking employees within Delta (Mr. Ealey and Ms. McColly). She also concedes that there is no evidence which might even suggest that either Ealey (an African American himself) or McColly (a woman) bore any racial or gender-based animus toward her. Nevertheless, she claims that because Giglio bore both gender and race-based animus towards her, he purposefully misled Ealey and McColly into believing that there

24

was a justifiable non-discriminatory basis on which to discipline her. Specifically, Straughn claims that Giglio, "the person whom Ms. Straughn has alleged discriminated against her on the basis of her race or gender or both, started the chain of events which led to her suspension, termination and subsequent reinstatement to a demoted position." Plaintiff's memorandum at 40.

Accordingly, Straughn's federal discrimination claims turn on two assertions: first, that Giglio was motivated by unlawful considerations when he provided (allegedly) misleading information to McColly and Ealey; and second, that Delta discriminated against her when it imposed on her a harsher sanction than that levied against a white male employee whom she says engaged in virtually identical conduct.

1. Giglio's Alleged Discrimination.

Initially, it is worth observing that Straughn has not offered much evidence that Giglio bore any racial or gender-based animus toward her. To be sure, Giglio's alleged use of an

25

affected "southern black" accent (if credited as true) certainly suggests racial bias. It is, however, unclear when (or even how often) Straughn claims she heard Giglio speak in that manner.

Straughn's complaint that Giglio chastised her for being late and for driving excessive miles, and that she was denied reimbursement for donuts she says she purchased for a customer, arguably support her discrimination claim to some degree, though the persuasive value of such evidence in not substantial. Certainly, there is also evidence in the record supportive of Giglio's claim that he bore no racial or gender-based animus toward Straughn, such as the fact that he consistently gave her positive performance reviews. See Plaintiff's memorandum at 5, 18.

At this juncture, however, the court cannot resolve factual conflicts in the record. Instead, it need only determine whether Straughn has presented sufficient evidence to justify the conclusion that a reasonable trier of fact could find that Giglio

26

did, in fact, "fabricate" the report that Straughn lied to him about her receipt of workers' compensation benefits as a pretextual means by which to have her disciplined because of her race or gender. See Mesnick v. General Electric Co., 950 F.2d 816, 828 (1st Cir. 1991) ("[T]he case boils down to what we have termed the ultimate question: did [plaintiff] present sufficient evidence the [defendant's] stated reason was a pretext for retaliation?"). As to that issue, the court is compelled to conclude that Straughn has failed to carry her burden.

Straughn cannot dispute the fact that her written statement (as well as her affidavit) acknowledges her lack of candor when responding to inquiries about her receipt of workers' compensation benefits. She specifically wrote: "When I spoke to my attorney she advised me until she had an opportunity to look into this do not advise of comp money. . . . When Lou [Giglio] asked me if I received comp, all I thought of was attorney advi[c]e [not to discuss my receipt of workers' compensation]". Exhibit 6 to Straughn deposition (emphasis supplied). See also

27

Straughn affidavit ("I was called into Lou [Giglio's] office and asked if I had received money from compensation to which I initially responded no, but went on to explain to him as I had in the past that I had received money from compensation to help with my expenses such as food, medicine, transportation, etc.") (emphasis supplied).

Thus, her assertion that Giglio "fabricated" the fact that she misled him about her receipt of workers' compensation is refuted by her own written statement and affidavit. Whether misguided by poor advice or for some other reason, Straughn did, in fact, mislead Giglio. Based upon her own written statement, it is apparent that Straughn's conduct was both knowing and purposeful: in unambiguous terms, she denied receiving workers' compensation benefits, and only acknowledged receiving periodic reimbursements for medical, travel, and related expenses. That misstatement, which was repeated on at least three occasions,

28

formed the basis of Ealey's and McColly's decision to terminate her employment.[6]

Straughn has introduced no evidence which even suggests that the decision to terminate her was based on anything other than Ealey's and McColly's justified understanding that she had repeatedly misled her superiors about the workers' compensation benefits. Nor has she introduced any evidence suggesting that Giglio was unreasonable or unjustified in believing that she was misleading him when she denied receiving those benefits. Most importantly, however, she has failed to present any evidence suggesting that Giglio's referral of the matter to Ealey and

---

[6]    Of course, Straughn claims to have been both misguided by what she says was her attorney's advice and "scared, confused, and virtually incoherent" when she prepared her written statement. See Straughn deposition at 137. That may explain her misleading statements, but it does not excuse them. Nor can Straughn legitimately complain that Giglio knew the answer to the question about her receipt of workers' compensation benefits before he asked it. Put simply, an employer has a legitimate right to expect that its employees will respond in a truthful, non-evasive manner to its questions, even when those questions are rhetorical or are ones to which the superior is confident he or she already knows the answer.

McColly based upon Straughn's misstatements was merely a pretext for unlawful and discriminatory efforts to see that she was disciplined.

In the end, whether Straughn actually lied or intended to mislead her superiors is immaterial. The court must necessarily focus on whether Giglio was justified in believing (and reporting to his superiors) that she lied. See, e.g., Gray v. New England Telephone and Telegraph Co., 792 F.2d 251, 256 (1st Cir. 1986) ("Thus, in assessing pretext in this instance, our focus must be on the perception of the decision-maker, i.e., whether [defendant] perceived the plaintiff as violating the back-to-work agreement and other company policies and whether this perception was credible and reasonable, in determining whether there was a jury issue."). See also Pollard v. Rea Magnet Wire Co., Inc., 824 F.2d 557, 559 (7th Cir. 1987) (en banc) ("a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination).

In a more recent opinion from the Court of Appeals for the Seventh Circuit (in a case involving alleged violations of several federal civil rights statutes), the court reaffirmed its holding in Pollard, supra, observing that:

> [Defendant's] investigation hardly looks world-class. (Surely there are better ways to investigate an employee like [plaintiff] who is suspected of dishonestly extending her disability leave - better, that is, than clandestinely following her around and videotaping her.) Yet this investigation was the reason given for her discharge and "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." In short, "no federal rule requires just cause for discharges." Therefore, [plaintiff's] energy is misspent by attacking the company's decisional process, unless she could point to facts suggesting that the company investigated her differently because she was an older employee (she has claimed age discrimination), or because she was on disability leave.

Kariotis v. Navistar International Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997) (citations omitted). And, as the court of appeals for this circuit has observed, "Errors in judgment are not the stuff of Title VII transgressions - so long as the 'mistakes' are not a coverup for invidious discrimination."

31

<u>Keyes v. Secretary of the Navy</u>, 853 F.2d 1016, 1026 (1st Cir. 1998).

The record plainly reveals (and Straughn does not deny) that Straughn was receiving two payments from the Delta agent charged with managing the workers' compensation fund:  regular weekly checks representing her workers' compensation benefits <u>and</u> occasional requested reimbursement checks for specific medical, travel, and related out-of-pocket expenses.  When questioned about those payments, she denied receiving the former, but acknowledged receiving the latter.  That was untrue.  And, based upon her lack of candor, the matter was referred to Ealey and McColly and the decision was made to terminate her employment.  Contrary to Straughn's assertions, there is nothing in the record to support her claim that Giglio "fabricated" a lie as part of some nefarious and discriminatory plot to see that she was disciplined because of her race or gender.  Whether she is willing to acknowledge it or not, the record plainly reveals that Straughn answered deceptively when asked about her receipt of

32

benefits and that deception formed the basis of the discipline imposed by Delta. That Giglio may (or may not) have been happy that Delta legitimately and justifiably chose to discipline her for her deceptive conduct is largely immaterial.

2. Delta's Alleged Disparate Treatment of Straughn.

Straughn next claims that she was the victim of unlawful discrimination because she was treated differently than a similarly situated white male employee. In support of that claim, Straughn points to the manner in which Delta disciplined one of its other sales representatives, John Higgins. She says that Higgins, who also worked out of the Boston office and reported directly to Giglio, falsified some of his weekly sales reports by lying about the frequency with which he visited his accounts. Delta responded by disciplining Higgins by, among other things, placing a "letter of concern" in his personnel file and transferring him to a less desirable sales territory. See Plaintiff's memorandum at 20, para. 104. Straughn asserts that her situation is virtually identical to that of Higgins (in that

both lied to their superiors) and yet she received a far more severe form of discipline. This, she attributes to racial and/or gender-based discrimination.

As Delta points out, however, Straughn's situation and that presented by Higgins' case are not sufficiently similar to warrant direct comparison. First, when confronted with the discrepancies in his weekly reports, Higgins immediately admitted to his false statements. Straughn, on the other hand, repeatedly misled her superiors (or, at best, provided consistently less-than-accurate responses) about her receipt of workers' compensation. In fact, notwithstanding her written statement to the contrary, she continues to deny that she misled Giglio when he questioned her about the benefits she was receiving. Additionally, Higgins' transgression resulted in no direct personal monetary gain or direct monetary loss to the company, whereas Straughn's efforts to conceal her receipt of workers' compensation benefits resulted in a personal windfall (at Delta's expense) of more than $11,000, which she has yet to repay.

34

In light of those differences in the situations presented by Straughn and Higgins, it is inappropriate to infer racial or gender-based discrimination on the part of Giglio or Delta simply because Higgins was disciplined in a manner that was marginally less severe than Straughn.  See, e.g., Stratus Computer, 40 F.3d at 17 ("In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from persons situated similarly in all relevant aspects.") (citations and internal quotation marks omitted) (emphasis in original).  The mere fact that both Straughn and Higgins lied to Delta is insufficient to warrant direct comparison of the two situations.[7]  But, even if the situations are deemed sufficiently alike to warrant comparison – both employees were treated essentially

_____

[7]     Straughn also suggests that Delta discriminated against her insofar as it normally allows employees who have received excess workers' compensation benefits to simply repay those monies to Delta.  She suggests that based upon Delta's discriminatory animus toward her, she was not given that option and, instead, was terminated.  As noted above, however, the record reveals that Delta terminated Straughn for having lied to her superiors, not for having received and retained excess payments.  Again, it is unhelpful for Straughn to attempt to draw comparisons between her situation and those presented by employees who were not similarly situated.

alike in the end (formal reprimand, transfer to less desirable and less lucrative position).

To survive summary judgment as to her federal discrimination claims, Straughn "had the burden of showing that there was sufficient evidence supporting the claimed factual dispute to require a jury to choose between the parties' differing versions of the truth at trial." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d at 10 (citation and internal quotation marks omitted). She failed to carry that burden. She has pointed to insufficient evidence to permit a reasonable trier of fact to conclude that: (1) Giglio or Ealey or McColly was not justified in concluding that she had lied when questioned about her receipt of workers' compensation benefits; or (2) that they handled her case differently because she is African American and/or because she is a woman. The record overwhelmingly supports just the opposite conclusion. Whether the conclusion reached was correct or incorrect, all parties involved in the decision to discipline Straughn had a reasonable basis to conclude that she lied to her

36

superiors and that justifiable conclusion formed the basis of Delta's decision to discipline her.

For the foregoing reasons, the court concludes that Straughn has failed to carry her burden of proof at the third stage of the McDonnell-Douglas three-part framework. She has not demonstrated that Delta was motivated by a racial and/or gender-based discriminatory animus when it terminated her employment. Nor has she introduced sufficient evidence to warrant the conclusion, by a reasonable trier of fact, that Delta's proffered justification for her initial termination and subsequent discipline upon reinstatement was, in fact, a pretext for unlawful discrimination. Consequently, Delta is entitled to judgment as a matter of law as to count one (Title VII) and count two (42 U.S.C. § 1981) of Straughn's complaint.

II. State Claims.

A. Subject Matter Jurisdiction.

Straughn does not assert that the court may exercise subject

matter jurisdiction over her state law claims by virtue of the parties' diversity of citizenship and an amount in controversy in excess of $75,000. See Complaint at para. 5. See also Fed. R. Civ. P. 8(a)(1) (requiring a plaintiff to set forth in her complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends"). Consequently, the court cannot simply presume that diversity jurisdiction exists. See, e.g., Century Southwest Cable Television, Inc. v. CIIF Associates, 33 F.3d 1068, 1071 (9th Cir. 1994) ("[Plaintiff] failed, however, to allege the amount in controversy; the jurisdictional requirements of 28 U.S.C. § 1332, therefore, were not met."); Citizens Committee to Save the Land Grant Railroads v. Burlington Northern, Inc., 708 F.2d 1430, 1435 (9th Cir. 1983) ("Since the plaintiffs made no allegations in the complaint respecting the citizenship of BRAC or the dollar value of the amount in controversy, the district court could not properly exercise diversity jurisdiction over the bond-related claim.").

Having failed to plead jurisdictional facts necessary to

permit the exercise of diversity jurisdiction over her state claims, Straughn simply asks the court to exercise supplemental jurisdiction over those claims. Because the court has granted Delta summary judgment as to all of Straughn's federal claims, however, it must first determine whether the exercise of supplemental jurisdiction over her state law claims is appropriate. As the Court of Appeals for the First Circuit has observed:

> A federal court exercising original jurisdiction over federal claims also has "supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C.A. § 1367(a) (West 1993). If, however, the court dismisses the foundational federal claims, it must reassess its jurisdiction, this time engaging in a pragmatic and case-specific evaluation of a variety of considerations that may bear on the issue.

Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998). Factors relevant to that determination include considerations of: (1) fairness to the various parties; (2) judicial economy; (3) comity; (4) the stage of the litigation at

39

which the parties presently find themselves (e.g., proximity to trial); and (5) the nature, complexity, and novelty of the state law claims raised by the plaintiff.

In this case, none of the factors identified above counsels in favor of declining to exercise supplemental jurisdiction. First, this case was filed nearly two years ago and, although originally scheduled for trial in November of 1999, trial is currently scheduled to begin next month. The parties have completed discovery, engaged in extensive motions practice, and submitted their pretrial materials, motions in limine, and proposed jury instructions. Thus, unlike the situation presented in Camelio, the parties here are on the eve of trial and appear prepared to go forward. To decline to exercise supplemental jurisdiction at this juncture would needlessly inconvenience the parties and result in an unnecessary burden on state judicial resources. It certainly would not represent an efficient use of limited judicial resources to require the parties to proceed to

40

state court, and relitigate the state claims before a court unfamiliar with the many details of the case.

Next, none of Straughn's state law claims raises any novel or especially complex question of law. Instead, her state law claims invoke fairly well-established principles of New Hampshire jurisprudence. By addressing the substance of Straughn's state law claims, the court would not be treading on an area best occupied by the state courts nor would it be called upon to apply any novel or "substantial" questions of New Hampshire law. Cf. Camelio, 137 F.3d at 672 (concluding that the trial court erred by exercising supplemental jurisdiction, in part, because "the claims that the court dismissed raise substantial questions of state law that are best resolved in state court.").

For the foregoing reasons, the court concludes that the interests of fairness, convenience of the parties, and judicial economy, all weigh in favor of exercising supplemental jurisdiction over Straughn's state law claims. See Camelio,

41

supra.  See also 28 U.S.C. § 1367.  And, because of the relatively straight-forward nature of Straughn's state law claims, considerations of comity do not counsel otherwise.  Consequently, the court turns to a discussion of Delta's motion for summary judgment as to those state law claims, as well as its motion for summary judgment on its counterclaim.

B.   Wrongful Termination.

To establish that she was wrongfully discharged, Straughn must demonstrate that Delta "was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment." Cloutier v. Great Atlantic & Pac. Tea Co., 121 N.H. 915, 921 (1981).  Then, she must also show that she "was discharged because [s]he performed an act that public policy would encourage, or refused to do something that public policy would condemn.  Id., at 922.  See also Howard v. Dorr Woolen Company, 120 N.H. 295, 297 (1980).

In support of her claim, Straughn says that she was "suspended and terminated because she received workers' compensation benefits to which she was entitled and because she refused to back-date benefits forms to cover [Delta's] failure to properly manage the Plaintiff's benefits." Complaint at para. 115. She also claims to have been wrongfully disciplined and demoted "because she pursued an appeal of her unjust and discriminatory suspension and termination." Id., at para. 116.

Straughn has, however, failed to present any evidence which might arguably support the reasonable inference that Delta terminated her because she was receiving workers' compensation benefits. Delta was well aware, for over a year prior to her termination, that Straughn was receiving workers' compensation benefits (what it apparently did not realize was that she was also receiving and retaining her full salary). That delay alone strongly suggests that Delta's subsequent disciplinary actions were not taken in retaliation for Straughn's having filed for

workers' compensation benefits.  See, e.g., Morgan v. Mass. General Hospital, 901 F.2d 186, 194 (1st Cir. 1990).

Moreover, the record demonstrates that Delta took disciplinary action against Straughn only after it reasonably came to believe that she had misled her superiors when they began to inquire as to whether she was being over-compensated during the period of her disability.  Thus, it was not that she was receiving workers' compensation benefits that prompted Delta's disciplinary action.  Rather, it was Delta's perception that she had made repeated efforts to conceal the fact that she was receiving far more than she was entitled to receive.  Straughn has failed to point to any genuinely disputed material facts which might support her claim that she was wrongfully terminated for having applied for and received workers' compensation benefits.

Straughn's claim that Delta retaliated against her for having pursued her appellate rights is especially flawed.  Far

44

from retaliating against her because she appealed, Delta actually rescinded its decision to terminate her employment and rehired or reinstated her because she appealed. It is difficult to imagine how that decision represents unlawful or otherwise actionable conduct. Far from being harmed by her pursuit of the appellate process, Straughn benefitted from that process - the decision to terminate her was revoked and she was rehired (albeit at a lower level position).

Finally, Straughn asserts that she was wrongfully terminated after she refused to back-date certain disability forms, which Giglio presented to her shortly after she returned to work, in April of 1997. She says that her suspension (roughly a month later) and subsequent termination were directly related to her refusal to back-date those forms. See Plaintiff's memorandum at 31 ("In regard to Ms. Straughn's wrongful termination claim it is important to note that soon after Ms. Straughn returned to work at Delta following her OJI, on or about April 1, 1997, Mr. Giglio presented her with disability forms. He asked her to backdate

45

those, which she refused to do, because she felt it would be untruthful to do so."). See also Id., at 47-48 ("Ms. Straughn submits that one of the things Mr. Giglio and Delta held against her was her failure to lie on their disability forms, which presumably should have been filled out at the time of her injury in January of 1996, rather than in April of 1997, when she was presented with them upon her return to work.").

Although it is far from clear, the court will assume, for purposes of this order, that Straughn has stated a viable claim for wrongful termination.[8] Unfortunately, however, other than

_____

[8] Parenthetically, the court notes that Straughn's assertion that she was "wrongfully terminated" may not state a viable claim under New Hampshire law. Contrary to Straughn's suggestion, she was not terminated. She was disciplined and demoted. As noted above, to state a viable claim for wrongful termination under New Hampshire common law, Straughn must allege that she "was discharged because [s]he performed an act that public policy would encourage, or refused to do that which public policy would condemn." Howard v. Dorr Woolen Company, 120 N.H. at 297 (emphasis supplied). See also Cloutier, 121 N.H. at 921-22 (1981); Monge v. Beebe Rubber Co., 114 N.H. 130 (1974). She has pointed to no New Hampshire cases which recognize a common law cause of action for "wrongful discipline" of an employee at will.

46

pointing to the temporal proximity between her refusal to back-date the forms and her subsequent discipline, Straughn has presented no evidence from which a reasonable trier of fact could plausibly conclude that Delta disciplined her as a result of her refusal to back-date those forms.  In fact, Straughn herself has presented evidence (i.e., her written statement, her deposition testimony, and her affidavit) which supports Delta's claim that she was disciplined for one reason and one reason alone: because she was deceptive when responding to questions about whether she was receiving duplicate benefits while on disability.

Additionally, it is unlikely that the New Hampshire Supreme Court would recognize that "public policy" is implicated when an employer asks an employee to back-date internal documents relating to a self-funded disability benefit plan, particularly when the request is made to bring the Company's records into conformity with underlined actual payments made to the employee.  That is to say, Straughn does not allege that she was asked to lie about the nature, amount, or duration of payments she actually received.

47

Rather, it seems that Giglio merely sought to make the records truthfully reflect, nunc pro tunc, what had actually occurred relative to her entitlement to benefits (the usual order of things presumably is injury, application for, and extension of benefits).

In light of the foregoing, the court is compelled to conclude that Delta is entitled to judgment as a matter of law as to Straughn's wrongful termination claim.

C.    Breach of Contract.

In count 7 of her complaint, Straughn alleges that Delta breached the terms of its employment contract with her by failing to comply with certain provisions of Delta's personnel policies. She says that those policies require an employee's supervisor to monitor the employee's workers' compensation status. Nevertheless, says Straughn, "Delta and its supervisors failed to properly monitor [her] benefits and then blamed their failure on [her]."  Plaintiff's complaint, at para. 127.

Although Straughn is an employee at will, she is not foreclosed from bringing a breach of contract claim against her employer. In <u>Panto v. Moore Business Forms, Inc.</u>, 130 N.H. 730 (1988), the New Hampshire Supreme Court recognized that "[b]ecause compensation and fringe benefits are usual incidents of this contractually governed economic relationship [between employer and employee], it is generally true that a statement on these subjects by the party who pays the compensation can be viewed objectively, as meant to be a subject of binding agreement." <u>Id.</u>, at 735 (citation omitted). Consequently, an at-will employee may bring a breach of contract claim against his or her employer for an alleged breach of statements contained in an employee handbook, when the acceptance of such handbook provisions is implicitly manifested by the employee's continued employment.[9]

_____

[9] It is, perhaps, important to note what Straughn does <u>not</u> appear to claim: she does not seem to allege that she was wrongfully terminated or terminated in breach of an implied provision of her employment when, following the appellate board's decision to reinstate her, she was, in fact, demoted. That may (or may not) be a viable claim. Straughn has not, however, advanced it. Moreover, it would seem likely that if she had such

49

An obvious potential weakness in Straughn's breach of contract claim is that she is likely not the intended beneficiary of the handbook provision upon which she relies.  According to Straughn, that portion of Delta's handbook provides that "the supervisor should establish a protocol for communication with the injured employee, the medical provider and the worker's compensation administrator."  Plaintiff's memorandum, at 32 n. 1.  Straughn liberally construes the scope of that provision, asserting that it imposed on Delta the affirmative obligation "to monitor an employee's workers' compensation benefits."  Plaintiff's memorandum at 31.  She describes her breach of contract claim as follows:

> Ms. Straughn's claim of Delta's breach of the covenant of good faith and fair dealing is premised upon Delta's failure to follow its own employment manual, which provided that it was an employee's supervisor's job to monitor that employee's benefits, which there can be no doubt that Mr. Giglio failed to do.  He obviously failed to take note that Ms. Straughn was receiving workers' compensation benefits.  Likewise, he failed to

a claim, she would first have to exhaust her internal appellate rights within Delta before she could sue.

50

> contact the personnel department to have her taken off the payroll so that she was not simultaneously receiving workers' compensation benefits and regular paychecks, which caused the entire alleged overpayment situation to occur.

Plaintiff's memorandum at 49.

Although neither party has addressed this issue, one might reasonably conclude that the provision on which Straughn relies is not intended to benefit her, but is intended to protect Delta, by insuring that precisely the sort of overpayments involved in this case (and concomitant loss to Delta) do not occur. It follows that the handbook provision in question might not give rise to any actionable duty on the part of the employee's supervisor (at least vis-a-vis the employee) to monitor those benefits and Straughn may well lack any breach of contract claim based on that handbook provision. See generally, Panto v. Moore Business Forms, Inc., supra. When a supervisor fails to monitor an employee's receipt of disability benefits, Delta may have reason to complain about the supervisor's performance but the employee may not.

51

Nevertheless, even assuming that the cited handbook provision actually does give rise to an enforceable obligation on the part of Delta to supervise an employee's receipt of workers' compensation and salary benefits, Straughn has failed to identify any damages she might have suffered as a result of Delta's alleged breach of that provision. All she has claimed is that Delta's conduct "caused the entire alleged overpayment situation to occur." Plaintiff's memorandum at 49. That is to say, Delta's alleged breach caused Straughn to receive more benefits than she was entitled to receive. Based upon that claim, it is difficult to define Straughn's injury. She was, without a doubt, overpaid. Consequently, she must reimburse Delta for that overpayment. She has, however, done nothing to describe the nature of any legally cognizable and compensable harm she might have suffered. For example, she does not (and likely cannot) claim that Delta's conduct should somehow free her of the obligation to repay the excess amounts she received.

Plainly, whatever injury Straughn might have suffered in this case flows directly from Delta's decision to discipline her. Although Straughn says that the over-payment of benefits "gave rise to" the situation which ultimately led to her discipline, it was not the proximate or legal cause of that discipline. As noted repeatedly above, Delta has demonstrated (and Straughn has not adequately refuted its claim) that it disciplined Straughn when it justifiably concluded that she had been deceptive to her superiors when questioned about her receipt of benefits. The mere fact that she received duplicate benefits certainly did not cause her to deceive her superiors. And, she has failed to identify any other possible harm that she might have suffered when Delta allegedly breached its obligation to monitor her benefits. Consequently, the court is constrained to conclude that Delta is entitled to judgment as a matter of law as to Straughn's breach of contract claim.

D.    Defamation.

The final count in Straughn's complaint alleges that Delta

53

and one of its employees published false and defamatory statements about her.  Specifically, she claims that her supervisor, Mr. Giglio, told her co-workers that she had been disciplined for "doing something very, very bad."  Plaintiff's memorandum at 50.  See also Complaint at paras. 131-33.  Giglio denies having made that comment.  And, the two Delta employees to whom Straughn says that statement was made have testified that Giglio never said anything of the sort to them.  See Affidavit of E. Jane Martin (Exhibit I to Delta's memorandum) and Affidavit of Michael Lucontoni (Exhibit J to Delta's memorandum).

Delta moves for summary judgment, asserting that Straughn has introduced no admissible evidence that she was defamed.  Instead, says Delta, Straughn relies solely on inadmissible hearsay: her own assertion that two employees (who deny it) said that Giglio made the statement.  See Fed. R. Civ. P. 56(e) (requiring that affidavits submitted in opposition to summary judgment "set forth such facts as would be admissible in evidence.").  Delta also argues that Giglio's alleged statement,

54

even if actually made, was conditionally privileged (insofar as it was made in good faith to fellow employees of Delta). Finally, and perhaps most fundamentally, Delta argues that the statement attributed to Giglio was substantially true: Straughn was disciplined based upon Delta's reasonable belief that she had done something "very, very bad" - knowingly and purposefully misleading her superiors about her receipt of duplicate benefits.

While Straughn claims to have justifiable motivations for having misled her superiors, and disputes the extent to which her statements were actually misleading (choosing, instead, to characterize them as incomplete and ambiguous, and blaming Giglio for having purposefully failed to seek clarification), she cannot dispute that she did, in fact, deny that she was receiving workers' compensation benefits when questioned. See, e.g., Exhibit 6 to Straughn deposition. And, as noted above, Straughn's lack of candor with her superiors formed the basis of her discipline. Thus, her claim for defamation must necessarily fail. Even if Giglio did say that Straughn had been disciplined

55

for having done something "very, very bad," that statement was, at a minimum, substantially true (correctly or incorrectly, Delta did discipline her based upon its justifiable conclusion that she had done something "very bad" - misled her superiors).

III. <u>Delta's Counterclaim</u>.

In its counterclaim, Delta seeks reimbursement from Straughn for the $11,608.86 in excess payments Straughn received from January 25, 1996 through July 4, 1996 (while she was receiving both her full salary for accident and sick leave and workers' compensation benefits for temporary total disability). For reasons not entirely clear from the record, Delta does not seek reimbursement for the approximately $20,000 in <u>salary</u> overpayments it claims to have made to Straughn between July, 1996, and April, 1997 (after Straughn's accident and sick leave time had expired).

It is undisputed that Straughn has yet to reimburse Delta for the roughly $11,000 Delta seeks. Nor does Straughn deny that

Delta is actually entitled to reimbursement for such overpayments. See Exhibit J to plaintiff's memorandum. Rather, she merely questions the sum which Delta says it is owed. Delta has, however, provided documentation supporting its claim that Straughn received $11,608.86 in over-payments during the period in question. See, e.g., Delta's response to interrogatory no. 23 (Exhibit B to Delta's responsive memorandum (document no. 70)).

Having failed to produce any evidence suggesting that she is not obligated to reimburse Delta the sum claimed or any evidence demonstrating that Delta has miscalculated that sum, Straughn has failed to identify any genuinely disputed material fact that might preclude the entry of judgment as a matter of law in favor of Delta as to its counterclaim.

## Conclusion

For the foregoing reasons, Delta is entitled to judgment as a matter of law as to all counts in plaintiff's complaint. It is also entitled to judgment as a matter of law as to its

counterclaim against Straughn for $11,608.86.  Accordingly, its

motion for summary judgment (document no. 26) is granted.  Its

motion to amend its answer (document no. 71) is denied as moot.

Judgment shall be entered accordingly.

        **SO ORDERED.**

                              _____
                              Steven J. McAuliffe
                              United States District Judge

March 21, 2000

cc:  Anna B. Hantz, Esq.
     Heather M. Burns, Esq.
     Jay D. Milone, Esq.
     Mark T. Broth, Esq.
     Martin J. Rooney, Esq.